IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Criminal Case No. 07-cr-00308-WYD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   **ERNESTO ANGULO**,
2.   MANUEL MEDINA-PEREZ,

    Defendants.

---

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.     <u>INTRODUCTION</u>

THIS MATTER came before the Court on Defendant Ernesto Angulo's Motion to Suppress Evidence (docket #23), filed August 31, 2007.[1] The Government filed a response, and the Court held a two-day hearing on Defendant's motion on December 14, 2007 and December 17, 2007. After fully considering the motion and response, as well as the evidence and arguments raised at the hearing, I find that Defendant's motion must be denied.

II.     <u>FINDINGS OF FACT</u>

After hearing the evidence and considering the arguments of both counsel, the Court makes the following findings of fact relevant to Defendant Angulo's (hereafter

---

[1] I address Co-Defendant Manuel Medina-Perez's Motion to Suppress Evidence and Statements (docket #26) in a separate Order.

referred to as "Angulo" or "Defendant") Motion to Suppress Evidence:

A. <u>Background Information</u>

On June 27, 2007, Detective Jamie Akens and other officers conducted surveillance on Room 237 at the Motel 6, located at 3050 West 49th Avenue, Denver, Colorado, because Detective Akens found indicators in the Motel register that are commonly associated with drug trafficking activities. (Tr. 4:9-25; 27:1-20.) Room 237 was registered to an individual by the name of Ernesto Angulo. (Tr. 5:1-2.) Angulo also registered with Motel 6, the Colorado license plate number 124NWO as the vehicle that he was parking at the motel during his stay. (Tr. 5:3-10.) Detective Akens ran this license plate number with the Colorado Department of Motor Vehicles and learned that this license number was assigned to a white 1990 Toyota pickup truck ("Toyota Truck") with a registered address for the vehicle at Amigos Auto Body located in the 4500 block of Morrison Road, Denver, Colorado. (Tr. 5:11-25.) Surveillance was also set up on the Toyota Truck. (Tr. 6:1-4.)

At approximately 11:50 a.m., a Dodge Stratus ( the "Dodge Stratus") with two occupants pulled up to the Toyota Truck. (Tr. 6:5-11.) Ernesto Angulo exited the Dodge Stratus and entered the Toyota Truck. (Tr. 6:12-25.) The driver of the Dodge Stratus was later identified as Manuel Medina-Perez. (Tr. 6:17-18.) The two vehicles left the parking lot and went to the address of 2721 East 98th Avenue, Thornton, Colorado where both vehicles parked. (Tr. 7:3-11.) Soon after, Medina-Perez and Angulo both got into the Dodge Stratus and drove to an Ace Hardware store located in the 7000 block of Pecos Street, Denver, Colorado. (Tr. 7:10-16.) Angulo and Medina-

Perez went into the store and came back out empty handed. (Tr. 7:17-19.) A store employee informed officers that Angulo and Medina-Perez were looking for Arctic White brand spray paint. (Tr. 7:20-9:2; 67:1-14.) The Defendants then went to several other stores and purchased an item. (Tr. 9:4-7.)

Medina-Perez and Angulo went back to 2721 East 98th Avenue, Thornton, Colorado. (Tr. 9:10-13.) A Ford truck was pulled out of the garage so that Angulo could pull the Toyota Truck into the garage; the garage door was then shut. (Tr. 9:14-18.)

Soon after, both Medina-Perez and Angulo left the residence in the Dodge Stratus and went to the Home Depot store in Thornton, Colorado where Angulo bought paint thinner. (Tr. 9:23-10:10.) After buying the paint thinner, Medina-Perez and Angulo went back to 2721 East 98th Avenue, Thornton, Colorado and re-entered the residence. (Tr. 10:11-19.)

Less than an hour later, the Toyota Truck was backed out of the garage, Angulo and Medina-Perez stood by the passenger rear side of the Toyota Truck and looked in the direction of the rear cab area of the Toyota Truck. (Tr. 10:25-11:14.) Angulo and Medina-Perez went back into the residence, and shortly after, Medina-Perez left in the Dodge Stratus. (Tr. 11:22-25.)

Later, Angulo exited the residence at 2721 East 98th Avenue, Thornton, Colorado, entered the Toyota Truck, and drove to a gas station. (Tr. 12:11-20.) While Angulo was filling the gas tank, Angulo again looked in the direction of the rear cab area of the truck. (Tr. 12:21-13:3.) Angulo then left the gas station and drove Eastbound on I-70. (Tr. 13:4-8.)

B. <u>Traffic Stop of Defendant Angulo</u>

On I-70, Detective Akens observed Angulo weave the Toyota Truck back and forth between the #1 and #2 traffic lanes several times. Detective Akens had also noticed that the Toyota Truck did not have a front license plate. (Tr. 13:9-14.) Detective Akens requested that uniformed officers conduct a traffic stop of the Toyota Truck. (Tr. 13:15-17.)

Prior to conducting the traffic stop, Uniformed Officer Andrew Richmond also observed the Toyota Truck change lanes without using a turn signal on I-70 approximately at Havana. (Tr. 47:22-48:7.) Officer Richmond conducted a traffic stop of the Toyota Truck. (Tr. 48:8-14.) Officer Richmond spoke to Angulo and asked for his driver's license, registration and proof of insurance.[2] (Tr. 48:16-17.) Angulo gave Officer Richmond an Arizona driver's license, a dealer registration, and an Arizona title to the vehicle in the name of Ricardo Aramburg Padilla. (Tr. 48:20-23; 202:1-203:1;

---

[2] Although Angulo's counsel has argued that Angulo did not understand English, the evidence does not support this assertion. Officer Richmond Spoke to Angulo in English, and Angulo responded in English. Angulo never told Officer Richmond that he did not understand Richmond's questions, and Angulo did not respond to those questions in any way that indicated that Angulo did not understand English. (Tr. 52:7-17.) Similarly, Detective Akens spoke to Angulo in English, and Angulo responded to Detective Akens in English. (Tr. 15:4-16.) Angulo did not appear confused by Akens's questions, ask Akens to repeat his questions, or tell Akens that he did not speak English. (Tr. 15:15-16:1.) Detective Spence spoke to Angulo predominantly in English but used a few Spanish words or Spanglish expressions. Angulo responded to Spence mostly in English with a few Spanish words. (Tr. 72:15-5; 86:10-22.) Angulo did not tell Spence that he did not understand Spence or ask Spence to repeat himself. (Tr. 72:20-73:6.) In an effort to cover all bases, Detective Spence attempted to repeat his request for consent to search in Spanish. (Tr. 77:19-78:18; 89:7-11.) Notably, when Angulo spoke to Detective Jesse Avendano in Spanish, Angulo told Detective Avendano that he had previously consented to the search of the truck when he was pulled over. (Tr. 105:15-19.) Accordingly, I find that Angulo understood the officers and gave an informed consent to search the Toyota Truck.

Gov't Ex. 5.)  Officer Richmond asked Angulo where he was coming from, and Angulo said that he was coming from Thornton.  (Tr. 49:8-11.)   Officer Richmond asked Angulo if he was the owner of the dealership to which the vehicle was registered, and Angulo said, "No."  (Tr. 49:15-19.)  Angulo told Officer Richmond that his friend "Moreno" was going to buy the truck and Angulo was driving it for her.  (Tr. 49:20-50:4.)  Angulo did not produce any evidence to substantiate this claim, nor did Angulo provide Officer Richmond with any evidence that he had a legal right to possess the Toyota Truck.  (Tr. 50:5-8; 59:21-60:8; 63:14-18.)  Officer Richmond then asked Angulo where he was going.  (Tr. 50:9-10.)   Angulo paused, looked up the roadway, and then said that he was going to a friend's house on Peoria Street. (Tr. 50:12-15.)  Peoria Street was the next exit off the highway.  Angulo was not able to give Officer Richmond any address for his friend's house on Peoria Street.  (Tr. 50:16-23.)  Officer Richmond asked Angulo if he had anything illegal in the truck, and Angulo said, "No." (Tr. 50:24-51:3.)  Officer Richmond asked if they could search the Toyota Truck. (Tr. 51:5-8.)  Angulo repeated that he had nothing illegal in the truck and said the officers could search the truck. (Tr. 51:9-11.)

At about this time, Detectives Richard Spence and Akens arrived at the location of the traffic stop and requested that the officers have Angulo exit the vehicle so they could talk to him. (Tr. 51:24-52-6; 69:7-10.)  Detective Spence observed that as Angulo exited the Toyota Truck, Angulo appeared nervous, was trembling, was breathing shallowly and quickly, and had a shaky voice.  (Tr. 69:11-18.)   Detective Akens asked if there was anything illegal in the truck, and Angulo said, "No." (Tr. 14:23-15:1; 69:22-

25.) Detective Akens then asked if they could search the truck and Angulo said, "Yes, go ahead." (Tr. 15:2-3; 69:25-70:3.) As Detective Akens approached the Toyota Truck, he smelled fresh paint and saw over spray on the rear window, the molding around the window and the top of the bed liner. (Tr. 16:3-8.) Detective Akens saw a duffel bag in the cab of the truck. Detective Akens looked inside the duffel bag and found clothing. (Tr. 17:8-10.) As Detective Akens was looking at the truck, Detective Spence continued to talk to Angulo. (Tr. 70:4-10.) Detective Spence asked Angulo whom the truck belonged to, and Angulo said that it belonged to a friend who owned a body shop in Denver. (Tr. 70:8-13; 70:22-71:4; 71:24.) Angulo told Detective Spence that he was in Denver on vacation to visit friends for two or three days. (Tr. 70:14-17.) Angulo stated that the last time he had been to Colorado was one year ago. (Tr. 71:6-12.) When asked how he got to Colorado, Angulo first said that he drove the Toyota Truck to Colorado. (Tr. 71:19-22.) When Detective Spence asked if Angulo's friend allowed him to keep the truck for a year, Angulo appeared startled and then changed his story and said that friends had driven him. (Tr. 71:23-72:3.) When Detective Spence asked which vehicles they drove to Colorado, Angulo said they drove two or three different vehicles. (Tr. 72:4-10.)

When Detective Spence joined Akens by the side of the Toyota Truck, Detective Akens pointed out white over spray on the rear windows of the truck. (Tr. 73:13-18.) Detective Spence also smelled fresh paint and noticed an uneven seam on the rear of the cab. (Tr. 73:19-25.) Detective Spence looked under the Toyota Truck and noticed that the nuts securing the bed of the truck appeared to have been recently removed,

and the dirt around those nuts also appeared to have been disturbed in a way that suggested that someone had recently removed the bed of the truck. (Tr. 74:1-23.) Detective Spence returned to where Angulo was standing and heard Angulo change his story again in that now he said that he traveled to Denver on an airplane. (Tr. 74:24-75:5.) Detective Spence asked Angulo why there was fresh paint on the Toyota Truck, and Angulo stated that he did not know. (Tr. 75:14-22.) Detective Spence further asked Angulo whether he had purchased spray paint that day, and Angulo said that he had not. (Tr. 75:24-76:2.)

Detective Theresa Discroll walked her K-9 around the Toyota Truck. (Tr. 76:6-9.) Angulo was watching the K-9, and when Detective Driscoll put her K-9 near the rear cab area of the Toyota Truck, Angulo appeared to stiffen up as if he were nervous and tense. (Tr. 76:10-19.)

Detective Spence informed Angulo that the K-9 had indicated that there was or had been narcotics in the Toyota Truck. Spence asked Angulo whether the officers could take the Toyota Truck to the police station and search it. (Tr. 77:1-21.) Angulo replied affirmatively. (Tr. 79:18-80:6.) Detective Spence further asked Angulo if he wanted to come down to the District Two Station while they searched the Toyota Truck or if he wanted to leave. (Tr. 80:12-20.) Angulo said he wanted to go with the officers. (Tr. 80:20.) Detective Spence advised Angulo that if he came with the officers, Angulo would need to voluntarily wear handcuffs while in the back of the police car. Angulo agreed. (Tr. 80:20-23.)

At the District Two Station, Detective Jesse Avendano, who is fluent in Spanish,

advised Angulo in Spanish of his Miranda rights and obtained a written consent to search the Toyota Truck and a written waiver of Defendant Angulo's Miranda rights. The consent and waiver forms were written in Spanish. (Tr. 101:3-105:12, Gov't Ex. 1 & 2.) Angulo also told Detective Avendano that he had already consented to search the Toyota Truck when he was pulled over. (Tr. 105:15-19.)

A search of the Toyota Truck revealed that there was a hidden compartment between the bed of the truck and the cab which contained cocaine. (Tr. 21:22-22:10; 81:1-22.)

III.    CONCLUSIONS OF LAW

A routine traffic stop is a seizure within the meaning of the Fourth Amendment, *United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir. 1997), but is characterized as an investigative detention rather than a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 437-39 (1984).

"Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (internal quotation marks omitted). In the context of a traffic stop, this means that once "a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning." *Id.*

A Defendant's claim that he has permission from the owner of the vehicle to operate it is not sufficient proof that he is entitled to operate the vehicle. *See United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (claim that registered owner

loaned him the truck was insufficient to prove that Defendant lawfully possessed the truck and justified the extension of the traffic stop).

During the traffic stop in this case, Officer Richmond determined that Defendant Angulo was not the owner of the Toyota Truck. (Tr. 49:15-19.) First, Defendant Angulo said that a friend of his was going to buy the truck and that he was driving the truck for the friend. (Tr. 49:20-50:4.) Later, Angulo said that a friend of his owned the truck. (Tr. 70:8-13; 70:22-71:4; 71:24.) Angulo never produced any evidence to support either claim. (Tr. 50:5-8; 59:21-60:8; 63:14-18.) Accordingly, I find that Defendant Angulo's failure to prove that he was the owner of the Toyota Truck, or that he had the owner's permission to drive the truck, alone justified the extension of the traffic stop. The Defendant's production of a dealer registration and certificate of title, which were in the name Ricardo Aramburo Radilla, was not sufficient proof of his entitlement to operate the vehicle because the Defendant's name did not appear on either document. Also, the Defendant did not produce any evidence that he had permission to operate the vehicle from either the dealer or Mr. Radilla, whose name appeared on the title. (Tr. 59:21-60:8; 73:14-18.) The Defendant's claims that someone named "Moreno" was going to buy the truck and that he was driving the truck for "Moreno" were not supported by any evidence. (Tr. 50:5-8; 59:21-60:8; 63:14-18.) Additionally, as Officer Richmond noted, the fact that the Defendant did not know "Moreno's" last name cast further doubt on the Defendant's story. (Tr. 57:4-10.) Finally, while Angulo argued at the December 14, 2007 hearing that he was transporting the car for the dealership, this was not the story he gave Officer Richmond on June 27, 2007. Angulo's story

cannot now be used to undermine the validity of the traffic stop on that date. Thus, I find that the extension of the traffic stop was justified and lawful because the Defendant never produced proof that he was entitled to operate the vehicle.

Additionally, after the purpose of a traffic stop has been accomplished, "[a]n officer may question the driver further if (1) the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning." *Patten*, 183 F.3d at 1193.

I also find that the officers developed reasonable and articulable suspicion that Defendant Angulo was engaged in illegal activity. When Officer Richmond asked Defendant Angulo where he was going, Defendant Angulo paused, looked up the road, and said he was going to a friend's house on Peoria Street, which was the very next exit off the highway. (Tr. 50:9-23.) Defendant Angulo, however, was unable to provide an address for his friend's house. (Tr. 50:16-23.) Officer Richmond asked Defendant Angulo whether he had anything illegal in the car and whether the officers could search the car. Defendant replied that he did not have anything illegal in the car and gave consent to search the car. (Tr. 50:24-51:11.)

Before a search was conducted, Detectives Akens and Spence spoke to Defendant Angulo. Detective Spence observed that Defendant Angulo appeared nervous, was trembling, was breathing shallowly and quickly, and spoke with a shaky voice. (Tr. 69:11-18.) Detective Akens asked Defendant Angulo if he had anything illegal in the truck and if the officers could search the truck. Defendant Angulo again said that he had nothing illegal and gave the officers his consent to search the truck.

(Tr. 14:23-15:3; 69:22-70:3.)  Detective Spence continued to talk to Defendant Angulo.  Defendant Angulo gave three different stories about how he traveled to Colorado.  (Tr. 71:19-22; 72:4-10; 74:24-75:5.)  The detectives observed the white over spray on the rear of the cab of the truck, smelled fresh paint, saw an uneven seam on the rear of the cab, and Detective Spence saw that the nuts securing the bed of the truck had recently been removed.   (Tr. 73:13-74:23.)  Additionally, when the officers asked Defendant Angulo about the fresh paint, Defendant Angulo lied and said he did not know anything about it and that he had not purchased paint that day.  (Tr. 75:14-76:2.)  Thus, I find that Defendant Angulo's nervous demeanor, evasive and deceptive answers to questions, the fresh paint and indicia that the bed of the truck had recently been removed all provided ample reasonable and articulable suspicion to extend the traffic stop.

      Finally, I find that Defendant Angulo gave his consent to search the Toyota Truck.  Angulo gave verbal consent three times on the side of the highway and did so in writing at the police station.  (Tr. 15:2-3; 51:5-11; 69:25-70:3; 77:1-80:6; 101:3-105:12.)   The evidence also demonstrates that this consent was voluntary.  In determining the voluntariness of a consent to search, the issue becomes whether the consent was "unequivocal and specific" and "freely and intelligently given," and whether it was given without duress or coercion.  *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).  Here, there is no evidence to suggest Defendant Angulo's consent was coerced, or that Defendant Angulo would be susceptible to coercion because of his age, intelligence or education.  On the contrary, Defendant Angulo is a

forty-year-old man who appears to be of at least average intelligence.  Under the totality of the circumstances standard, I find that Defendant Angulo's consent to search was freely and voluntarily given.  *See, e.g., United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (consent to search voluntary, given lack of coercive behavior of officer, even though Defendant not informed of right to refuse consent).  Accordingly, I find that Defendant Angulo's motion to suppress must be denied.

IV.     CONCLUSION

Based on the foregoing facts and law, it is

ORDERED that Defendant Angulo's Motion to Suppress Evidence (docket #23), filed August 31, 2007, is **DENIED.**  It is

FURTHER ORDERED that the parties shall file a joint status report within ten days of the date of this Order indicating whether the case should be set for trial and if so, how much time remains on the speedy trial deadlines.

Dated:  February 25, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge